THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES O'BRIEN, Appellant.

First Department, July 10, 1975

*Norman Fraiden* for appellant.

*Jane Louise Koch* of counsel *(Mario Merola, District Attorney),* for respondent.

LYNCH, J. The defendant O'Brien and two codefendants, McClendon and Wilson, were convicted after a jury trial of robbery in the second degree, grand larceny in the third degree and petit larceny. This court affirmed Wilson's and McClendon's robbery conviction but reversed and dismissed the grand and petit larceny charges *(People v Wilson,* 48 AD2d 638). The prosecuting attorney concedes that there is no evidence to establish O'Brien's guilt of grand larceny and that petit larceny would be a lesser included crime were the robbery affirmed. (See *People v Pyles,* 44 AD2d 784.) O'Brien appeals his conviction primarily on the ground that he was not proven guilty beyond a reasonable doubt; that the evidence falls short of showing that he acted in concert with the robbers Wilson and McClendon. He implies that he was as intimidated by them as were the robbery victims.

The crime occurred at the home of Mr. and Mrs. Vaiano in The Bronx. According to the prosecution version, O'Brien,

alone, rang the doorbell as they were preparing for bed, about 1:30 in the morning. The Vaianos knew O'Brien as one from the neighborhood. Before this he had sold them some steaks. This time Mr. Vaiano opened the kitchen door and, through the locked screen door, O'Brien tried to sell him some cigarettes. During their dickering, Mrs. Vaiano joined them at the door. Vaiano testified that when he turned away to get a drink of water he heard the screen being cut. He leaped to push his wife aside just as McClendon reached through the cut screen, opened the door from the inside, entered and put a butcher knife to Vaiano's stomach. O'Brien and Wilson followed McClendon in, in no specified order. Vaiano had seen Wilson before with O'Brien; he did not know McClendon.

Both Mr. and Mrs. Vaiano testified that throughout the events that followed until the three intruders left, O'Brien sat on a chair in the kitchen. He "didn't do anything to any of us —nothing. O'Brien just sat there". Vaiano added that O'Brien seemed "dumbfounded" at what was happening.

Wilson went into a daughter Louise's ground floor bedroom, took an inexpensive watch and ring, and, placing his butcher knife against her throat, threatened to stab her if she did not keep quiet. Mr. and Mrs. Vaiano testified that Mrs. Vaiano got between her husband and McClendon's threatening knife. Her husband then grappled with McClendon but stopped when Wilson came in from the bedroom and put his knife against Mrs. Vaiano's back. They stated that McClendon then swung his knife and cut Vaiano on the face and hand. Wilson then took about $85 from a kitchen cabinet.

At this point, according to the Vaiano testimony, McClendon pointed his knife at O'Brien, who was still on the kitchen chair, and said, "I'll fix you on the outside". Wilson then cut the telephone cord and all three fled, running down the street, McClendon and Wilson on each side and O'Brien in the middle.

The daughter Louise testified that she knew O'Brien from having seen him in the neighborhood and that she knew his voice from having heard him speak on the street and in the playground adjoining the Vaiano home. She said that while lying on her bed that night, she heard O'Brien in the kitchen "cussing" and using "bad words". She was permitted to say that these words were directed toward her parents, but it was not demonstrated how she could possibly have known this since she was in another room. She was then asked, "What

did your mother and father say", and she answered, "He said take anything you want, just, you know—leave us alone".

The defense version was totally different. All of the defendants testified. They said that they had gone to the Vaiano house together: O'Brien by prearrangement with Mrs. Vaiano to pick up some money promised him for cigarettes he had previously sold her husband; Wilson to collect money he said Vaiano owed him for a tape recorder; McClendon tagged along with the others not knowing where they were going. They testified that they were invited in after O'Brien had rung the bell. They sat in the kitchen and discussed the money owed. The discussion led to argument which led to grappling among Mr. and Mrs. Vaiano, McClendon and Wilson. It all halted when Vaiano threatened to call the police if they did not leave. They said that they then left, that nothing was taken, that the telephone cord was not cut and neither was the screen door.

Where there are contrary versions of an event, one inculpatory and the other exculpatory, it is the province of the jury to find the facts and, in doing so, determine credibility. As long as the facts found are grounded in the evidence, the jury's judgment on credibility will not be supplanted by that of an appellate court (People v Regina, 19 NY2d 65; People v White, 2 NY2d 220). Thus this jury's rejection of the defendants' version and its acceptance of the prosecution version is unassailable. Upon this principle and the facts most favorable to the prosecution, Wilson's and McClendon's convictions had to be affirmed.

It is O'Brien's argument, however, that the same facts, while inculpating Wilson and McClendon, do not inculpate him. His guilt, he argues, could only be found by drawing inferences from those facts and that, since the inferences that are able to be drawn from them point as much to innocence as they do to guilt, his conviction should be reversed and the indictment dismissed. (See People v Razezicz, 206 NY 249; People v Fellman, 42 AD2d 764.)

As far as O'Brien is involved, the facts most favorable to the prosecution establish that while he, Wilson and McClendon went to the Vaiano house together, the latter two remained out of sight while he rang the bell and talked to Vaiano about the cigarettes. When Vaiano turned to get the drink, McClendon cut the screen, opened the door and pushed his knife into Vaiano's stomach. Wilson and O'Brien followed McC-

lendon in, but we have no way of knowing in what order. O'Brien then went to a kitchen chair and sat there until he and the others left. According to those in the room he appeared dumbfounded; he did nothing. Louise Vaiano heard him "cussing" and using bad words, following which her father said, "Take anything you want, just leave us alone". McClendon pointed his knife at O'Brien, saying, "I'll fix you on the outside". The three left, running down the street, Wilson and McClendon on each side and O'Brien in the middle.

From O'Brien's appearance alone at the door, it is possible to infer that he, Wilson and McClendon had planned that, while Vaiano might be afraid to open the door to all three, he would open it for the one he knew best. It is also possible to infer that Wilson and McClendon, by the threat of their knives, forced O'Brien to appear alone for the same purpose. After McClendon entered it is possible to infer that O'Brien entered as part of a concerted effort to rob Vaiano. It is also possible to infer that he entered under the threat of Wilson's knife. It is possible to infer that O'Brien's "cussing" and bad words were directed to Vaiano to which Vaiano made reply to O'Brien. It is also possible to infer that O'Brien's "cussing" and bad words were directed toward Wilson and McClendon and that Vaiano's following remark was also addressed to them. The latter inference is the more probable because it provides an explanation for McClendon's threat to O'Brien. Under that inference the threat was genuine. Otherwise the threat has to be inferred to have been camouflage for O'Brien's criminality. From the flight of the three, it is possible to infer their common guilt. From O'Brien's position between Wilson and McClendon it is possible to infer that he continued to be a victim of their violence.

Since the facts found by the jury do not inculpate O'Brien, and since the inferences which may be drawn from those facts are as consistent with innocence as with guilt, O'Brien's conviction must be reversed on the law and the indictment dismissed.

CAPOZZOLI, J. (dissenting). I am not in accord with the conclusion reached by the majority and the reasons contained in its opinion to support the reversal of this conviction. The very facts set forth in its opinion unquestionably justify the guilty verdict reached by the jury. Even in its reasoning, to a great extent, the majority supplies legal arguments in support

of the jury's verdict. I might well rest on the contents of the majority opinion to support my own conclusion that there was ample evidence before the jury to sustain its verdict.

Let us start off with the fact that this defendant, with two others, who were convicted with him, went to the home of the complainant, Vaiano, in order to collect money, which the defendant testified was coming to him and to the codefendant, Wilson, for stolen articles and unregistered cigarettes which were allegedly sold to Vaiano on prior occasions. That is a rather strange occurrence, that they should decide to go to Vaiano's house, at 1:30 in the morning, to collect moneys. It is conceded that there was no money coming to the defendant, McClendon. He just went along for the ride at this time of the night.

The majority's opinion amply sets forth what took place when the trio reached Vaiano's house. Suffice it to say that the evidence justifies the conclusion which the jury must have reached to the effect that, when the defendant was denied admission by Vaiano, who had not seen the other two defendants, the screen door which separated Vaiano from these defendants was cut by one of them. After the defendant, McClendon, reached through the cut screen and opened the door from the inside, O'Brien and Wilson followed him. It must be remembered that McClendon put a butcher knife in Vaiano's stomach. Of course, this was denied *in toto* by the defendant, but, is that not a reason why jury trials are held, so that the truth may be ascertained? It should also be noted that the defendant denied that either of his two codefendants had knives.

The purpose of breaking into this complainant's home, in the middle of the night, was to get money, which was allegedly owed to the defendant for his stolen goods. Were his actions consistent with those of one who was peacefully trying to collect what was due to him, or was he out to get his money in any way that he could?

It is interesting to note that the majority, although they support the conviction of the two codefendants, appears to take seriously the possibility that the defendant was intimidated by the codefendants. Note this language in the majority opinion: "He implies that he was as intimidated by them as were the robbery victims". That is a strange observation, because a reference to the record clearly discloses that this defendant denied having been attacked or threatened by the

codefendants at any time. And, while we are on the subject, there was never any claim at the trial that the defendant's part in this crime was the result of duress against him on the part of his codefendants. In that connection attention should be called to the fact that duress is an affirmative defense and the burden of proof is upon the defendant to establish same by a preponderance of the evidence. Subdivision 1 of section 40.00 of the Penal Law reads in part:

"1. In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist."

A reference to subdivision 2 of section 25.00 of the Penal Law, discloses the following: "When a defense declared by statute to be an 'affirmative defense' is raised at a trial, the defendant has the burden of establishing such defense by a preponderance of the evidence."

The majority has written "from O'Brien's position between Wilson and McClendon, it is possible to infer that he continued to be a victim of their [codefendants'] violence". There is no possible justification in the entire record for this inference. And, of course, the jury rejected it, else it would have acquitted this defendant.

While it may be true that the defendant did not participate to as great an extent as his codefendants, the evidence clearly shows that he was part and parcel of their activities, having started with them, gone with them to the Vaiano house, having entered with them when he was unable to have the door opened to his ringing and knocking, as a result of which the screen door was cut, remaining in the place during the robbery and running away with them from the scene, clearly mark him as a willing participant in this entire situation.

Let us look at page 453 of the record where we find the following:

"Q. When Mrs. Vaiano said, I want you to help me push Wilson out of the apartment or the house, what did you do?

"A. I didn't want nothing to do with it, because they owe me money and I was sitting down there to get my suitcase and my money right".

In that event, was this not a perfect occasion for this

defendant to say to the court and jury that the reason why he would not help Mrs. Vaiano was because he was afraid of his codefendants? But, there was no such claim, because the truth is, whatever this defendant did, he did of his own free choice and not because of any fear or duress.

Although there was ample testimony to indicate that each of his codefendants had a knife, and both codefendants used those knives to instill fear in their victims to the extent of having cut Mr. Vaiano, this defendant testified he saw no knives, and there were no assaults by his codefendants against the complainants.

What was the defendant McClendon's function in this whole episode? The answer is found at pages 518 to 519 of the record:

"Q. Did you hear Joe McClendon say anything at this time?

"A. Yes.

"Q. What did Joe say?

"A. He said give him his money.

"Q. Didn't you say yesterday on direct examination 'you better give him the money' when asked what Mr. McClendon said?

"A. He said * * * he said give him the money.

"Q. Well, was it give him the money or you better give him the money?

"A. I don't remember."

Again, some one might try to spell out from this record that whatever might have been the original intention of the defendant when the trio started out to rob the complainants, perhaps the defendant changed his mind while the robbery was going on. Of course, there is no indication of that, and it must be remembered that the defense of renunciation is another affirmative defense which is spelled out in subdivision 1 of section 40.10 of the Penal Law: "In any prosecution for an offense, other than an attempt to commit a crime, in which the defendant's guilt depends upon his criminal liability for the conduct of another person pursuant to section 20.00, it is an affirmative defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant withdrew from participation in such offense prior to the commission thereof and made a substantial effort to prevent the commission thereof."

The majority argues that the inferences which may be

drawn from the facts in the case are as consistent with innocence as with guilt. This principle of law does not apply in the case at bar. We are not dealing with a case based upon circumstantial evidence. The record presents a situation where witnesses for the prosecution testified to what they saw and heard as to how the defendants got into the apartment and what they did once in there. The evidence presented is direct evidence and it was up to the jury either to believe it or refuse to believe it. Having chosen to believe the People's evidence, this court should not interfere with the conclusion reached by the jury.

I am satisfied from an examination of the record and the reasons above given, together with those set forth in the majority opinion, that the conviction of the appellant was based on sufficient legal evidence to establish his guilt beyond a reasonable doubt and the verdict of the jury should not be disturbed.

MARKEWICH, J. P., and MURPHY, J., concur with LYNCH, J.; KUPFERMAN and CAPOZZOLI, JJ., dissent in an opinion by CAPOZZOLI, J.

Judgment, Supreme Court, Bronx County, rendered on August 30, 1973, reversed, on the law, and the indictment dismissed.